CREDITORS COMPOSITION CORPORATION, Respondent, v. AMERICAN MARACAIBO COMPANY, Appellant, Impleaded with BANCAMERICA-BLAIR CORPORATION, Defendant.

First Department, May 31, 1935.

*Frederick R. Ryan* of counsel [*Caruthers Ewing* and *Samuel A. Adamson* with him on the brief; *McCombs & Ryan*, attorneys], for the appellant.

*Benjamin P. DeWitt* of counsel [*Sidney Pepper* with him on the brief; *Benjamin P. DeWitt*, attorney], for the respondent.

GLENNON, J. There are three appeals in this action. All are taken by the defendant American Maracaibo Company. The first is from a final judgment in the sum of $189,290.99, which was entered upon a verdict of a jury. The second is from an order denying said defendant's motion to set aside the verdict and for a new trial. The third is from an order entered at Special Term in so far as it denied a motion for summary judgment under rule 113 of the Rules of Civil Practice. No error is assigned by either party based upon the dismissal of the action as to defendant Banc-america-Blair Corporation, upon its application for summary judgment.

The action is brought on the theory that plaintiff's assignor had loaned money to defendant American Maracaibo Company. The facts leading up to this litigation are substantially as follows:

A petition in bankruptcy was filed against Bauer, Pogue, Pond & Vivian, a brokerage firm in New York, in November, 1930. The firm entered into a composition agreement with its creditors as a result of which plaintiff corporation was formed April 25, 1931, and took over its assets. There were nine directors of the plaintiff, one of whom, James Lee Kauffman, was selected as president, and Benjamin P. DeWitt, the attorney for plaintiff, was elected treasurer. The officers and directors who were selected at

the first meeting continued in office until May, 1934, when Kauffman and at least one of the other directors resigned.

In the early part of 1929, plaintiff's assignor, Bauer, Pogue, Pond & Vivian, together with others, were heavily involved financially in the American Maracaibo Company, which was in need of funds. On April 29, 1929, an agreement was drawn. Plaintiff's assignor was one of the subscribers to it. Since its provisions bear materially upon the issues to be determined upon this appeal, it is quoted in full as follows:

*"April* 29, 1929.

" AMERICAN MARACAIBO COMPANY,
    " New York, N. Y.

" DEAR SIRS: For a valuable consideration, receipt whereof is hereby acknowledged, and in consideration of the mutual agreements herein contained, each of the undersigned hereby agrees, subject to the terms and conditions hereinafter stated, to advance to you from time to time at your request amounts aggregating not exceeding the percentage of $800,000 set opposite his or its name below.

" Each of the undersigned shall be liable hereunder only for the percentage of the aggregate amounts to be advanced hereunder set opposite his or its name below. None of the undersigned shall be liable or responsible for any default on the part of any other of the undersigned.

" Each of the undersigned is to advance forthwith upon the execution hereof his or its proportion of $575,000, and the further advances to be made hereunder will be made from time to time within three days after a written request for such advance, signed by a majority of the members of the Executive Committee of American Maracaibo Company (hereinafter called the Corporation), or signed by the Chairman of the Board, President or Vice-President of the Corporation and accompanied by a certified copy of a resolution of the Executive Committee of the Corporation, authorizing such request, shall be delivered by the Corporation to Blair & Co., Inc. No advances shall be made hereunder after July 15, 1929. For all amounts advanced pursuant to this letter, the Corporation will deliver to Blair & Co., Inc., its note or notes for the amounts so advanced, dated the day of such advance, payable to Blair & Co., Inc., or order, on August 1, 1929, and bearing interest at the rate of 8% per annum. Of the amounts so advanced, not exceeding $475,000 is to be applied to or toward payment of a demand note of the Corporation for a like amount, and the remainder may be used in the discretion of the Corporation for the payment of indebtedness or for other corporate purposes.

" Blair & Co., Inc., shall hold the note or notes delivered to it pursuant hereto for account of the undersigned in proportion to their respective interests therein. Blair & Co., Inc., may take such action in respect of any such note or notes as Blair & Co., Inc., may deem to be for the best interest of the undersigned, and shall incur no liability for any action taken hereunder except for bad faith or willful malfeasance.

" At the request of any party hereto, Blair & Co., Inc., will deliver to such party a negotiable participation certificate or certificates in such form as Blair & Co., Inc., may determine, evidencing the interest of such party in any note or notes held by Blair & Co., Inc., pursuant hereto.

" So long as any note or notes issued pursuant hereto shall be outstanding, the Corporation shall not, without the written consent of the undersigned, mortgage or pledge any of its assets, or permit any subsidiary company to mortgage or pledge any of its assets.

" The agreements herein contained shall be effective and binding when this letter shall have been signed by the Corporation, and by persons, firms or corporations the percentages set opposite whose names aggregate 84% or more. Additional signatures may be added thereafter. ·

" The agreements herein contained shall bind and benefit the Corporation and the undersigned and their respective legal representatives, successors and assigns.

" If the foregoing is in accordance with your understanding, please confirm it by signing and returning the enclosed duplicate hereof.

" Yours very truly.

| Name | Percentage to be Advanced |
|---|---|
| Blair & Co., Inc., By George Armsby, Vice Pres | 41.7195 |
| Bauer, Pogue, Pond & Vivian | 12.25 |
| William M. Chadbourne | 4.9 |
| [SEAL] The Famoth Corporation by H. S. Fahlbusch, Vice Pres | 11.8178 |
| [SEAL] The Shermar Corporation by J. F. Wernersbach, Treas | 13.9039 |
| [SEAL] Confirmed: AMERICAN MARACAIBO COMPANY by FRANK FINSTHWAIT, Vice Pres. | |

" F. J. RYAN, Secretary."

It will be noted, in passing, that the " percentage to be advanced " which appears after the names of the parties, represented the interest which each held in certain stock options of the appellant. Although

Blair & Co., Inc., and later its successor, Bancamerica-Blair Corporation, was not specifically named as syndicate manager, nevertheless, it acted in that capacity with the approval of all the parties to the agreement, at least prior to.the bankruptcy. The record discloses that it had acted in a similar position for the stock option group before the syndicate agreement was drawn.

In the course of time, the appellant became indebted to the syndicate in the sum of $925,000 for loans made under the syndicate agreement. The advances made by plaintiff's assignor amounted in all to the sum of $133,954.80. The American Maracaibo Company under the provisions of the syndicate agreement gave to Bancamerica-Blair Corporation its unsecured note for $925,000 payable on February 3, 1930. In accordance with the terms of the agreement, Bancamerica-Blair Corporation gave to the assignor and the other parties participation certificates in the note to the extent of the advances made by each. In December, 1929, the assignor declined to make any further advances under the syndicate agreement. There were extensions of American Maracaibo Company's indebtedness to the syndicate at various times from August 1, 1929, to October 31, 1929. The last one was given on November 30th of that year. On that day a question arose between the assignor and Bancamerica-Blair Corporation as to extensions, with the result that Bancamerica-Blair Corporation notified them that it would not grant any extension of the note beyond February 3, 1930, without their consent.

Although the note had matured, it was not paid on February 3, 1930, but no steps seem to have been taken at that time with reference to its collection or renewal. It will be remembered that a petition in bankruptcy was filed against the assignor in November, 1930, and the plaintiff corporation came into being on April 25, 1931. Apparently the question of the collection of the note was permitted to rest by the syndicate manager, and also by the plaintiff corporation for a period of about a year and a half, as the record shows that it was not until November, 1932, that the question pertaining to the $925,000 note and other notes which were then outstanding was considered. About that time, the appellant corporation expressed a willingness to issue a new note in the sum of $1,470,227.02 and to give collateral security to cover it, in place of the $925,000 note which was unsecured, and other notes then outstanding under the syndicate agreement of April, 1929. The proposed arrangement was suggested to Kauffman, the president of the plaintiff, by the Bancamerica-Blair Corporation, and by Fred Bauer, one of plaintiff's assignors, who still had a contingent interest in plaintiff's assets.

The testimony of Kauffman is not disputed, that on December 30, 1932, Bauer advised him that it would be proper for plaintiff to agree to the new arrangement, which involved an extension of time to pay. Furthermore, there is no contradiction of his testimony that on the same day he spoke to Bauer he telephoned to Mr. DeWitt, the treasurer and director of the company, and the latter agreed to the proposed arrangement.

On March 28, 1933, Bancamerica-Blair Corporation forwarded the formal extension agreement to plaintiff. On April third following, Kauffman, as president, consented to it. The extension agreement provided for the consolidation of all the outstanding notes into a new note in the sum of $1,470,227.02, which was to run to November 8, 1935. There was an additional provision in the agreement that a further extension to November 8, 1937, might be had if one T. G. Hendrick, who was also a creditor of the corporation, continued his claims for a like period. It will be noted, however, that Hendrick was not a party to the original syndicate agreement of April 29, 1929.

The new note, together with the security, was delivered by defendant to the manager of the syndicate in April, 1933. In September, 1933, plaintiff paid its proportionate share of the legal expenses incurred by Bancamerica-Blair Corporation in consolidating the notes, with its check signed by Kauffman, as president, and DeWitt, as treasurer. The last meeting of the board of directors prior to that date was held on December 19, 1932, and the next meeting took place on October 24, 1933. It would seem that, during this period at least, the board of directors of the corporation relied upon its president and treasurer to handle its corporate affairs. At the meeting on October 24, 1933, Kauffman testified in substance, also without contradiction, that the question of the new note, and the advisability of selling it at sixty cents on the dollar, or even fifty cents, was discussed. Further, in answer to an inquiry on the part of one of the directors as to the increase of the amount of the note, he informed the board that interest had been added to the old principal and that resulted not only in increasing the note, but also the company's share in it as was evidenced by the participation certificate.

The board of directors next met on April 25, 1934. A motion then was made for the first time by a Mr. Pepper, one of DeWitt's law associates, to disaffirm the action of Kauffman, as president, in signing any document which extended the time of appellant for the payment of its indebtedness. There were four votes in favor of the motion, including that of Mr. DeWitt, and four opposed. One week later, at a subsequent meeting, the matter was again

brought up, with the result that the action of the president was disaffirmed by a vote of six to three. Mr. Kauffman thereupon resigned as president.

We believe that the judgment entered at Trial Term should be reversed and the complaint dismissed for two reasons: The first one is that the plaintiff, in its individual capacity, has no cause of action against the defendant. The second reason is that the plaintiff is estopped by its general course of conduct from disaffirming the ratification of the new agreement.

We have reached the conclusion that plaintiff has no cause of action because its rights under the syndicate agreement could be no greater than those of its assignor. In construing the meaning of the agreement, we should take into consideration the surrounding circumstances at the time it was made. All the members of the syndicate were engaged in a joint enterprise. The advances by the members were made solely for the purpose of protecting their options on defendant's stock. The transaction was not one involving an ordinary loan. The original note evidencing the indebtedness pursuant to the terms of the agreement, was given to Blair & Co., Inc., which acted as syndicate manager. The loan was not made to the appellant by Bauer, Pogue, Pond & Vivian, the assignor, nor did the appellant promise to repay it to it. The promise to repay on the part of the appellant was made to Blair & Co., Inc., under the terms of the syndicate agreement. As a further evidence of the intent of the parties it was provided: " At the request of any party hereto, Blair & Co., Inc., will deliver to such party a negotiable participation certificate or certificates in such form as Blair & Co., Inc., may determine, evidencing the interest of such party in any note or notes held by Blair & Co., Inc., pursuant hereto." When the funds were collected by the syndicate manager, the participation certificates issued in each instance would be evidence of a debt which Blair & Co., Inc., as manager owed to plaintiff's assignor and the other members.

We now consider the second reason why this recovery should not be permitted to stand. The facts which have been detailed at some length quite clearly indicate that the question pertaining to the consolidation of the outstanding notes and the replacement by the note in the sum of $1,470,227.02, together with the furnishing of collateral security for it, was taken up in about the month of December, 1932, with Kauffman as president of the plaintiff corporation. His testimony was not denied by DeWitt, the treasurer, that on December 30, 1932, the latter agreed to the new arrangement. On April 3, 1933, the plaintiff through its president consented to the agreement. Sometime later defendant gave the col-

lateral security which was provided for in the new agreement, and also delivered the new note. All the other parties to the original agreement ratified the new arrangement, and as result thereof the position of each party was changed.

In September, 1933, as we have seen, the plaintiff corporation paid its share of the legal expenses connected with the drawing of the extension. On October 24, 1933, the members of the board of directors had full and complete knowledge of the fact that appellant had issued a new note to the syndicate manager and had given collateral security for it.

The testimony of its former president was not denied by DeWitt or any other member of the board of directors as to what transpired at the meeting of October twenty-fifth. In *Wylde* v. *Northern R. R. Co. of N. J.* (53 N. Y. 156), Judge ANDREWS said: " The defendants knowing the truth and omitting to speak, every inference warranted by the evidence should be indulged against them." That statement is particularly applicable to the members of plaintiff's board of directors, who failed to take the stand and dispute the testimony of Kauffman. Nothing was done, as we have seen, until April 25, 1934, when a motion was made, without success, to disaffirm the act of Kauffman, and it was not until May 2, 1934, that the motion was finally carried. It seems to us to have been a rather late day for the members of the board of directors of plaintiff corporation to have attempted to resort to a change of position on its part, which, if permitted to stand, would work a grave wrong to the other parties who had ratified the agreement and acted upon it. It must be remembered that, in so far as the appellant was concerned, it had changed its position by giving collateral security for the new note, whereas, under the terms of the original agreement, it was not required so to do.

Since we have determined after a review of all the facts contained in the record, that the judgment entered upon the verdict should be reversed, we believe it proper to dismiss the appeal in so far as it pertains to the motion for summary judgment.

The judgment appealed from and the order denying a new trial should be reversed, with costs, and the complaint dismissed, with costs, and the appeal from the order denying the motion for summary judgment dismissed.

MARTIN, P. J., MERRELL, TOWNLEY and UNTERMYER, JJ., concur.

Judgment and order denying motion for a new trial reversed, with costs, and complaint dismissed, with costs. Appeal from order denying motion for summary judgment dismissed.